FILED
2007 Apr-27  PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CAROLYN S. FORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-S-2510-NE** |
| | ) | |
| **KURT EKLUND, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Carolyn Ford, seeks damages from defendant, Kurt Eklund, Inc., for violation of the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., and for fraudulent suppression in contravention of Alabama law.[1]  The case was tried before the court, sitting without a jury, on April 10, 2007.  The court received testimony from Ford herself, as well as the owner of Kurt Eklund, Inc., Kurt Eklund, and his wife and business partner, Sheila Smith Eklund.  After giving full consideration to the testimony and arguments of counsel, the court makes the following findings of fact, and enters conclusions of law.  *See* Fed. R. Civ. P. 52(a).

### PART ONE

*Findings of Fact*

---

[1] Doc. no. 1 (Complaint).

This case revolves around an emerald and diamond necklace, reportedly worth well over $30,000.[2]  Carolyn Ford, who has worked in the jewelry business, received the necklace as a gift from her husband and children in the latter part of the last decade.[3]  While the necklace must have had some sentimental value to Mrs. Ford, it apparently was also a useful nest egg when there arose a need for quick cash.  Twice, she took the necklace to Kurt Eklund, Inc., a Huntsville, Alabama pawnshop, and pledged it in exchange for short-term loans of various amounts of United States currency.[4]  According to Mrs. Ford, she initially picked the Eklund establishment because she had "seen their shop before, and it looked very nice and expensive."[5]

Mrs. Ford's first transaction with Kurt Eklund, Inc. took place on or about March 31, 2004.[6]  She and her husband, Robert Ford, brought the necklace in and struck a deal with Kurt Eklund, whereby the Fords would receive an immediate cash advance of $5,000, and the pawnshop would receive (at least tentatively) the necklace

---

[2] Trial Transcript, p. 5, lines 3-22.

[3] *Id*. at lines 5-16.

[4] Plaintiff's Ex. 1 (Exchange Ticket Dated August 26, 2005); Plaintiff's Ex. 3 (Exchange Ticket Dated March 31, 2004).

[5] Trial Transcript, p. 4, lines 11-12.

[6] *Id*. at p. 15, lines 3-6.  This first transaction does not form any part of the basis of this lawsuit.  *See* doc. no. 1, p. 3 (limiting allegations to a second transaction that occurred on August 26, 2005); doc. no. 31 (Pretrial Order), ¶ 5 (same).  Even so, it is relevant to establish the parties' course of dealing and to explain the reasons for the transaction that *is* central to this case.

-2-

as collateral.[7]   To memorialize the arrangement — which Kurt Eklund himself described at trial to be a "*loan* of $5,000"[8] — an exchange ticket was executed.[9]   The ticket is identical in format to the other ticket involved in this case.  Neither bears a title, but on the upper right-hand side, in bold print, the words "Collateral" and "Loans" are printed.[10]   Below those words, there are separate columns running vertically down the right side of the document, labeled (from top to bottom): "Amount Borrowed," "Finance Charge," "Total To Redeem," and "Monthly Rate."[11] At the bottom of the tickets, two somewhat inconsistent recitations appear.  The first, right above the pledgor's signature, states that the item described therein is "PAWNED FOR ONE MONTH ONLY."[12]   The other, immediately below the signature, reads "This ticket may be renewed."[13]

Above both of these notices, but still toward the bottom of the tickets, is the following text:

IN CONSIDERATION OF THEIR MUTUAL PROMISES, THE

---

[7] *Id*. at p. 4, lines 2-8, 18-19; *id*. at p. 15, lines 3-16; *id*. at p. 28, lines 1-8.

[8] *Id*. at p. 28, line 5 (emphasis supplied).  *See also id*. at line 14 ("The *loan* itself was defaulted.") (emphasis supplied).

[9] *Id*. at p. 15, lines 14-15.  *See also* Plaintiff's Ex. 3.

[10] Plaintiff's Ex. 3.

[11] *Id*.

[12] *Id*. (capitalization in original).

[13] *Id*.

PARTIES AGREE AS FOLLOWS:  A pledgor shall have no obligation to redeem the pledged goods or make any payment on a pawn transaction.  Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker. . . . The item pawned is redeemable only by the bearer of this ticket.[14]

This first ticket, dated March 31, 2004, listed the "Amount Borrowed" as $5,000, revealed a "Finance Charge" of $1,000 (*i.e.*, 20% of the principal indebtedness), and set the "Monthly Rate" at 20%.[15]  The ticket initially fixed the "Maturity Date" of the loan as April 30, 2004, and designated $6,000 as the "Total to Redeem."[16]  However, at the Fords' request and upon payment of an additional $1,000, that date was later extended one month, to May 30, 2004, and the pawnshop waived the right to recover any additional interest.[17]  The new date came and went without any payments or redemption, and hence the loan entered default.[18]  Mr. Ford finally tendered $7,000 in full payment of the principal amount and accumulated "finance charges" on July 12, 2004; and despite the warning on the ticket about

---

[14] *Id*. (capitalization in original).

[15] Plaintiff's Ex. 3.

[16] *Id*.

[17] Trial Transcript, p. 8, lines 6-19; *id.* at p. 15, lines 16-22; Plaintiff's Ex. 3; Plaintiff's Ex. 4 (Receipt for Interest Payment); Plaintiff's Ex. 8 (Agreement for One Month Extension).

[18] Trial Transcript, p. 28, lines 15-18.

forfeiture, the Eklunds simultaneously returned the necklace.[19]  Irregularities aside, it seems all parties were satisfied with the results of their initial transaction.

The Fords and Eklunds did not have any further relevant dealings until August 26, 2005.  On that date, Carolyn Ford traveled alone to the Eklund establishment.[20]  At trial, Mrs. Ford explained that her husband was out of town and had forgotten to leave her any money, so she needed a short-term loan.[21]  She selected Kurt Eklund, Inc. because "we had been there before, and I trusted them."[22]  Mr. Eklund told Mrs. Ford that he had only $2,000 in available cash, and the parties accordingly reached an agreement for a loan in that amount.[23]  (The court's use of the term "loan" conforms to parties' apparent understanding of this transaction.[24])

To evidence the agreement, the parties executed a ticket identical in form to the one discussed above.  The "Amount Borrowed" was fixed at $2,000, the "Finance Charge" was set at 20% of the principal amount (*i.e.*, $400), and the "Monthly Rate"

---

[19] Plaintiff's Ex. 5 (Notation of Redemption).  *See also* Trial Transcript, p. 16, lines 5-15; *id.* at p. 28, lines 16-24.

[20] Trial Transcript, p. 16, line 16 - p. 17, line 1.

[21] *Id*. at p. 9, lines 10-13.

[22] *Id*. at p. 12, lines 5-8.

[23] *Id*. at p. 17, lines 2-12; *id.* at p. 29, lines 4-13.

[24] Asked what type of transaction she thought she was entering into, Mrs. Ford testified that she felt it was "[a] loan." *Id*. at p. 8, lines 19-25.  Mr. Eklund also testified that Mrs. Ford "asked for *a loan* for the same necklace [that had served as collateral for the first transaction]," and explained that "[t]he *loan* was made for 30 days." *Id*. at p. 29, lines 5-10 (emphasis supplied).

was also 20%.[25]  The loan was to mature in thirty days, on September 26, 2005.[26]  The same disclaimer recited above appeared on this ticket as well, so although the ticket indicated it could be renewed, it also warned that "[p]ledged goods not redeemed within 30 days following the originally fixed maturity date [were to be automatically] forfeited to the pawnbroker."[27]

What did *not* appear was any statement or explanation of the "annual percentage rate," using that term, or "A.P.R.," using that abbreviation.[28]  Moreover, the "Finance Charge" is not any more conspicuous than the other disclosures (all of which are in very small print), and it is not accompanied by any explanatory language.[29]  Nevertheless, Mrs. Ford explained at trial that she was familiar with standard loan disclosures, having utilized loans since she was a teenager; and, indeed, having entered into a very similar loan with the same business, with the same interest rate, and using the same necklace as collateral, just over a year earlier.[30]  She knew, for instance, that "it's understood when you make your loan, wherever you go, what the interest rate is, and for how much your payments are going to be, and for what

---

[25] Plaintiff's Ex. 1.  *See also*, *e.g.*, Trial Transcript, p. 29, lines 10-13.

[26] Plaintiff's Ex. 1; Trial Transcript, p. 19, lines 5-7.

[27] *See* Plaintiff's Ex. 1.

[28] Trial Transcript, p. 9, lines 3-9; *id*. at p. 20, lines 8-11.

[29] Plaintiff's Ex. 1.

[30] Trial Transcript, p. 12, lines 9-11; *id*. at p. 17, lines 4-22.

period of time those payments are to be made, and the dates they are to be made."[31] And, with respect to this particular transaction, she "understood it was either 30 or 45 days, and [that she] would be paying $2,400, unless there were other arrangements made."[32]  As for other collateral charges, Mrs. Ford "fully understood there would be interest . . . , and that [she] would pay it back and receive [her] merchandise."[33] Notwithstanding all of this, Mrs. Ford admitted repeatedly at trial, "I didn't really read the pawn ticket. . . . I didn't really look at it."[34]  Asked more specifically — "[s]o you didn't peruse the ticket to see really what disclosures were [or were not] on the ticket, as far as APR, monthly interest rate, amount borrowed, or number of payments, or that kind of thing?" — she answered simply, "No."[35]  Instead, Mrs. Ford testified:

---

[31] *Id*. at p. 12, lines 17-21.

[32] *Id*. at p. 18, lines 14-21.

[33] *Id*. at p. 17, lines 10-12.

[34] *Id*. at p. 18, lines 2-10.

[35] *Id*. at lines 4-8.  The court notes that Mrs. Ford later exclaimed "Gosh, no" when asked whether she would "have borrowed money if there had been an annual percentage rate disclosed of over 4,000 percent."  *Id*. at p. 23, lines 10-13.  The court essentially disregards this testimony, for three reasons.  First, the effective annual percentage rate in this case was *not* "over 4,000 percent" — it was, as noted in Mrs. Ford's complaint, approximately 240%.  *See* doc. no. 1, p. 3.  Second, the answer is not worthy of belief because, when originally asked the same question, Mrs. Ford testified that such a disclosure "would not have affected my decision."  Trial Transcript, p. 23, lines 1-4.  She then went on to begin explaining how a loan deal was truly a matter of personal trust in her mind before apparently realizing that her answer was not advancing her cause and asking her attorney to give her another chance at answering a rephrased question.  *See id*. at lines 6-10.  Third and finally, if the annual percentage rate had been important to Mrs. Ford, one would suppose she would at the very least examine the terms of the ticket that she was given, which indisputably disclosed at least the monthly interest rate.

"I trusted them, because I had been there and had dealt with them before."[36]

Had Mrs. Ford read and comprehended the disclosures that *were* printed on the ticket, she would have realized that she was committing to pay approximately $4,800 a year in interest on a $2,000 loan.  In the end, however, that did not matter, because Mrs. Ford never paid back the principal or interest on this loan.[37]  Her trial testimony as to *why* she did not pay off the loan was frustratingly vague.  Based on reasonable inferences therefrom, it appears that Mrs. Ford began engaging in what she perceived as negotiations concerning the possibility of renewing the loan prior to the original maturity date of September 26, 2005.[38]  Sheila Smith Eklund acted as the pawnshop's intermediary for these discussions.[39]  Mrs. Ford recalled that,

> the first time I called, I just called to make sure that my necklace was in the safe, and [Sheila Eklund] assured me that it was in the safe, and that it was okay, and for me not to worry.
>
> And I think then I called her and told her my daughter was in the hospital, and wanted to make sure we were in good standings and my necklace was still okay.  And she said for me not to worry, to take care of my daughter.
>
> And there were two or three other times after that I called her.[40]

---

[36] Trial Transcript, p. 21, lines 2-3.

[37] *Id*. at p. 53, lines 1-7.

[38] *See*, *e.g.*, *id*. at p. 21, lines 4-9.

[39] *Id*.

[40] Trial Transcript, p. 10, lines 7-19.  Incidentally, Mr. Eklund testified that he was unaware of any agreement whatsoever that allowed Mrs. Smith to tender repayment of the two thousand

-8-

Mrs. Ford was pressed further about these conversations, and the implications

thereof, during cross-examination:

> Q.    So, as I understand [it] your argument is, you're basically — you
> feel like that there was an oral agreement between yourself and
> Kurt Eklund, Inc., that you would be allowed to redeem your
> necklace past the maturity date of the pawn ticket; is that correct?
>
> A.    With Sheila [Eklund], yes.
>
>         . . . .
>
> Q.    But is it not true, though, that you did not, *within 60 days of*
> *August 26th of 2005*, that you either did not make a monthly

---

dollar loan after the maturity date.  *See id*. at p. 30, lines 8-14.  His wife Sheila, on the other hand, admitted having conversations with Mrs. Ford about repayment.  *See id*. at p. 34, lines 15-25.  Her testimony is brief and somewhat vague, but from it, the court can see how Mrs. Ford could have been confused or led to believe that payment after the originally fixed maturity date, but before the expiration of the forfeiture period, would be acceptable:

> Q.    You deny having any conversations with M[r]s. Ford concerning postponing
> payments in this case?
>
> A.    I had conversations with M[r]s. Ford.
>
> Q.    All right.  You admit that she told you when she was coming in to pay it;
> right?
>
> A.    She called during the — there's a limited time, the 30 days [following the
> maturity date].  If she calls *during that time* and tells me she's coming in at
> the end of the week, I say, "yes, that will be fine."
>
> Q.    So you would have told her that would be fine?
>
> A.    Sure.  *As long as the pawn transaction was active*, that's what I would tell
> her.

*Id*. at p. 34, line15 - p. 35, line 1 (emphasis supplied).

payment or you did not make a total payment to redeem the necklace; is that true?

A.    *I did not make a payment*, but I was not told that I had to make a payment when I called her all those times.

Q.    Okay.  But you did not either make a monthly interest — you did either not pay the 20 percent monthly rate charge, *nor did you try to pay the $2,000 that you had borrowed*, did you?

A.    *No*.  She always told me when I called her, "don't worry about it, everything's okay, Carol."  And I trusted her, because we had dealt with them before.[41]

Despite this testimony, Mrs. Ford also claims that — *prior to the expiration of the sixty day payoff window* — she went to the Eklund pawnshop in an attempt to discharge the loan and redeem the necklace.[42]  Mrs. Ford explained at trial that she and her husband arrived with $3,500 in cash, intending to satisfy the principal balance, plus all interest and charges,[43] but Mr. Eklund refused to accept payment and told them he would not return the necklace.[44]  After much prodding, Mr. Eklund admitted that the Fords did telephone, and visit, his pawnshop in an attempt to pay, but only *after* the expiration of the redemption period set forth on the ticket.[45]  To

---

[41] Trial Transcript, p. 22, line 4 - p. 22, line 3 (emphasis supplied).

[42] *Id*. at p. 10, lines 22-25; *id*. at p. 42, line 16 - p. 43, line 10.

[43] *Id*. at p. 10, line 22 - p. 11, line 18.

[44] *Id*. at p. 13, lines 21-24.

[45] *Id*. at p. 52, lines 1-12, 16-21; *id*. at p. 52, line 24 - p. 53, line 4.

overcome this testimony and her own previous admission that she never attempted to pay *during the sixty day period*, Mrs. Ford mustered only self-contradicting statements,[46] and the suggestion that her bank statements (not produced at trial or introduced into evidence) could establish the date on which she withdrew the $3,500.[47]  These proffers are not persuasive, and will not suffice.  The court finds that, although Mrs. Ford might have reached an agreement with Mrs. Eklund under which she would be permitted to satisfy her indebtedness later than initially contemplated, she nonetheless failed to make any attempt to fulfill her obligations and redeem the necklace "within 30 days following the originally fixed maturity date."[48]

Of course, this also is the conclusion reached by the proprietors of the Eklund pawnshop.[49]  Mr. Eklund determined that the collateral had been forfeited, rendering him the sole owner thereof.  *See* Ala. Code § 5-19A-6 (providing that "[p]ledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest to the goods shall vest in the pawnbroker.").  Exercising what he perceived as his prerogative, Mr. Eklund refused to allow the Fords to redeem the necklace.  Mrs. Ford therefore

---

[46] *See*, *e.g.*, *id*. at p. 43, lines 5-7 ("I don't know the exact date, but I sure know it wasn't 30 days later.  It was probably within a two-week period.").

[47] *Id*. at p. 49, lines 1-2.

[48] Plaintiff's Ex. 1.

[49] *See*, *e.g.*, Trial Transcript, p. 36, lines 18-22.

retained attorney C. Knox McLaney III, and filed this lawsuit against Kurt Eklund, Inc., seeking money damages as well as all costs and attorney's fees incurred in prosecuting the action.[50]  At trial, the court received into evidence an itemized billing statement from Mr. McLaney, reflecting charges and expenses in the total amount of 13,655.42.[51]  A review of that bill reveals that Mr. McLaney spent just over forty nine hours on the case, at a rate of $250 per hour (for a total fee of $12,312,50), and incurred $1,342.92 on incidental expenses.[52]  The court's own records indicate that a filing fee of $250 was paid.

Speaking of remuneration, it turns out that Sheila Eklund eventually sold the emerald and diamond necklace to Jim Preuitt, a member of the Alabama State Senate from Talladega, Alabama.[53]  Mr. Eklund testified that Senator Preuitt paid $11,000 for the item, having no idea that it was the subject of this litigation.[54]  Mrs. Ford was not aware that the necklace had been sold until hearing testimony to that effect at trial.[55]

## PART TWO

---

[50] Doc. no. 1.

[51] Plaintiff's Ex. 9 (Itemized Bill).

[52] *Id.*

[53] Trial Transcript, p. 35, lines 2-8.

[54] *Id.* at p. 32, lines 2-3.

[55] *See id.* at p. 33, lines 4-18.

*Conclusions of Law*

As mentioned, Mrs. Ford brings this lawsuit under both state and federal law. The laws differ significantly, not only in their genesis, but also in their substance. The federal Truth in Lending Act ("TILA") is a strict liability statute; once a plaintiff proves a disclosure violation, at least some damages are owed regardless of the defendant's state of mind or other circumstances. *See*, *e.g.*, *In re Porter*, 961 F.2d 1066, 1078 (3d Cir. 1992) ("TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made.") (internal quotations and citation omitted).  Alabama's law of fraudulent suppression, on the other hand, requires, among other things, evidence that the defendant had actual knowledge of the undisclosed fact, and that the plaintiff's lack of knowledge concerning that fact induced her to act to her detriment.  *See* Ala. Code § 6-5-102; *Liberty National Life Insurance Company v. McAllister*, 675 So. 2d 1292, 1296 (Ala. 1995).[56]  It is the distinction between these two laws that leads the court to conclude below that Mrs. Ford is due judgment, at least in part, on her TILA claim, while Kurt Eklund, Inc. must prevail on the fraudulent suppression count.

## A.     The TILA Claim

---

[56] This is not to imply, however, that *intent* is required.  *See Davis v. Stern, Agee & Leach, Inc.*, ___ So. 2d ___, No. 1050478, 2007 WL 80810, at * 13 (Ala. Jan. 12, 2007) (citing *Intercorp, Inc. v. Pennzoil Company*, 877 F.2d 1524, 1535 (11th Cir. 1989) (applying Alabama law)).

The TILA "was enacted to ensure meaningful disclosure of credit terms so that the customer can make intelligent and informed decisions among available credit term options." *Hyde v. Hutto Enterprises, Inc.*, Civ. A. No. 94-D-13-N, 1994 WL 653504, at * 2 (M.D. Ala. 1994). Because TILA "is a remedial statute," it is "to be liberally construed in favor of the consumer." *Cody v. Community Loan Corp.*, 606 F.2d 499, 505 (5th Cir. 1979), *cert. denied*, 446 U.S. 988 (1980).[57] "Due to the 'complexity and variety' of credit transactions which 'defy exhaustive regulation by a single statute,' Congress 'delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit.'" *Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1112 (S.D. Ala. 1997) (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 560 (1980)). The Board has adopted Regulation Z, 12 C.F.R. 226.1 *et seq.*, to flesh out the statute. This case is based largely on that lengthy regulation.[58]

---

[57] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[58] Although no such arguments have been pressed in this case, a common question in similar cases is whether the TILA and Regulation Z actually apply to pawnbrokers. A review of the decisions and regulations reveals that it does. Another district court in this state observed almost ten years ago that, "[a]lthough few courts have addressed the issue, those which have uniformly hold that pawnbrokers are subject to the [TILA]." *Wiley*, 950 F. Supp. at 1112 (citing *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261 (9th Cir. 1993); *Hyde*, 1994 WL 653504; *Pendleton v. American Title Brokers, Inc.*, 754 F. Supp. 860 (S.D. Ala. 1991); *Dennis v. Handley*, 453 F. Supp. 833 (N.D. Ala. 1978)). Note that *Wiley* was, for a time, questionable law on *another issue* — reasonable reliance in claims for recovery of actual damages under the TILA. The Eleventh Circuit, however, ultimately

Mrs. Ford's TILA claim is that Kurt Eklund, Inc., failed to make the disclosures required by 15 U.S.C. § 1638(a) and the regulations interpreting it.  As mentioned above, Regulation Z provides most of the substantive disclosure rules to be applied.  However, parts of Regulation Z parrot the disclosure requirements listed in § 1638(a) itself.  One case from the Middle District of Alabama provides a succinct summary of the requirements:

> Pursuant to Regulation Z [and 15 U.S.C. § 1638(a)], lenders are to accurately disclose the following features: the amount financed, an itemization of the amount financed, the finance charge, the annual percentage rate of the loan and the payment schedule.  12 C.F.R. § 266.17.  Moreover, the terms "amount financed", "finance charge", and "annual percentage rate must appear on the face of the "pawn agreement."  12 C.F.R. § 226.18(b), (d) and (e).  Furthermore the finance charge must be made more conspicuous than any other disclosure.  12 C.F.R. § 226.17(a)(2).

---

concluded that issue was correctly decided in *Wiley.  See Turner v. Beneficial Corporation*, 242 F.3d 1023 (11th Cir. 2001) (*en banc*), *cert. denied*, 534 U.S. 820 (2001).  The applicability of the TILA to pawnbrokers has not been addressed by the Eleventh Circuit, *id.*, but the court is satisfied that it applies.

The disclosure requirements of the TILA apply in "consumer credit transaction[s]."  *See* 15 U.S.C. § 1638(a).  The TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of a debt or to incur debt and defer payment."  15 U.S.C. § 1602(e).  In other words, a loan amounts to a covered consumer credit transaction.  Both Mrs. Ford and Mr. Eklund repeatedly described the transaction at issue in this case as a "loan" even though the ticket did not require repayment, and the court seconds that interpretation.  *See, e.g.*, *Wiley*, 950 F. Supp. at 1112-13 ("The lack of a legally enforceable obligation to repay does not transform a pawn transaction into something other than credit."); *Dennis*, 453 F. Supp. at 836 (holding that a pledgor is a "customer" under the TILA and that a pledge of property to a pawnbroker results in the pledgor incurring a "debt" under the TILA).  *See also* 61 Fed. Reg. 14952 (1996) ("When, in connection with an extension of credit, a consumer pledges or sells an item to a pawnbroker creditor in return for a sum of money and retains the right to redeem the item for a greater sum (the redemption price) within a specified period of time, disclosures are required [by the TILA].").

*Hyde*, 1994 WL 653504, at * 2.  Moreover, under, Regulation Z, the creditor must disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation," plus "[t]he total of payments, using that term, and a descriptive explanation such as 'the amount you will have paid when you have made all scheduled payments.'"  12 C.F.R. §§ 266.18(g), (h).

Here, Mrs. Ford's complaint alleges (and even a cursory glance at the pawn ticket clearly confirms) multiple violations.  Without listing all of the infractions, the court notes that it already determined that the annual percentage rate was not disclosed.  Indeed, the parties stipulated to that fact at the pretrial conference.[59]  There are other failings as well, but they are immaterial — "[a] creditor can only be liable for a single recovery even though there are multiple truth-in-lending violations." *Jackson v. Columbus Dodge, Inc.*, 676 F.2d 120, 121 (11th Cir. 1982).  *See also* 15 U.S.C. § 1638(g) (providing that "[t]he multiple failure to disclose to any person any information required . . . to be disclosed in connection with a single . . . consumer loan . . . shall entitle the person to a single recovery").

Having concluded that there was a disclosure violation, recovery is rather straightforward.  Under the civil enforcement provisions of the Truth in Lending Act:

---

[59] *See* doc. no. 31 (Pretrial Order), ¶ 5(a) ("Neither the words 'Annual Percentage Rate,' nor the abbreviation 'A.P.R.' appear on the receipt.").

> [A]ny creditor who fails to comply with any requirement imposed under [the TILA] . . . with respect to any person is liable to such person in an amount equal to the sum of —
>
>> (1) any actual damage sustained by such person as a result of the failure;
>>
>> (2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction; . . . [and]
>>
>> (3) in the case of any successful action to enforce the foregoing liability . . . the costs of the action, together with a reasonable attorney's fee as determined by the court.

15 U.S.C. § 1640(a). *See also Turner v. Beneficial Corporation*, 242 F.3d 1023, 1025 (11th Cir. 2001) (*en banc*) (discussing available damages under the TILA).

These award provisions are, for the most part, self-explanatory: "once the court finds a violation, no matter how technical, it has no discretion with respect to the imposition of liability [for statutory damages under 15 U.S.C. § 1640(a)(2)(A)]." *Grant v. Imperial Motors*, 539 F.2d 506, 510 (5th Cir. 1976). *See also Charles v. Krauss Company*, 572 F.2d 544, 546 (5th Cir. 1978) (same). Accordingly, Mrs. Ford is due an automatic award of $800, representing twice the finance charge of $400 levied in connection with her August 25, 2005 loan. *See* 15 U.S.C. § 1640(a)(2)(A); *Turner*, 242 F.3d at 1026. As a prevailing plaintiff, Mrs. Ford also is entitled to recover her costs and attorney's fee, as calculated below. *See* 15 U.S.C. § 1640(a)(3); *Purtle v. Eldridge Auto Services, Inc.*, 91 F.3d 797, 800 (6th Cir. 1996) ("A plaintiff

in a TILA case need not prove that he or she suffered actual monetary damages in order to recover the . . . attorneys' fee.").

The only wrinkle in the award phase of the TILA claim is whether Mrs. Ford is entitled to actual damages. The Eleventh Circuit recently examined the requirements for recovery of actual damages under the Act, focusing specifically on the need for a showing of reliance:

> We now reconsider whether detrimental reliance is required for a TILA claim for actual damages. We note that the statute provides that a plaintiff is entitled only to "any actual damages sustained . . . as a result" of a TILA violation. 15 U.S.C. § 1640(a)(1). We find that this language indicates that the statute's authors intended that *plaintiffs must demonstrate detrimental reliance in order to be entitled to actual damages under TILA.*

*Turner*, 242 F.3d at 1028 (emphasis supplied). Although the rule is captured well within that quote alone, legislative history cited by the court also provides helpful context:

> Section 130(a) of TILA allows a consumer to recover both actual and statutory damages in connection with TILA violations. Congress provided for statutory damages because actual damages in most cases would be nonexistent or extremely difficult to prove. To recover actual damages, consumers must show that they suffered a loss because they relied on an inaccurate or incomplete disclosure.

*Id*. (quoting H.R. Rep. No. 193,104, 104th Cong., 1st Sess. (1995)). The court in *Turner* did not go to any length to explain what showing would suffice for

-18-

detrimental reliance.  Based on *dicta* in the opinion, however, one possibility might be to establish that, but for the omissions by the pawnbroker, the plaintiff would have sought out and obtained better credit or more desirable credit terms.

Here, however, Mrs. Ford testified unequivocally that she did not even bother to read the pawn ticket to ascertain the monthly rate of interest, despite knowing that interest was a component of the loan.  In other words, the presence or absence of proper disclosures made no difference.  Instead, Mrs. Ford made it very clear that she sought a loan from the Eklund pawnshop because she *trusted them*.  She openly admitted passing over other possible sources of money based solely on her feeling that the Eklunds were trustworthy individuals.  Had she testified that she turned down other credit opportunities because it appeared to her, *based on the faulty disclosures*, that she had obtained a good deal, the court would be inclined to award actual damages.  She is not, however, due compensation for misplaced trust and blind ignorance.  *See Turner*, 242 F.3d at 1028 (holding that "a plaintiff must present evidence to establish a causal link between the financing institution's noncompliance and his damages").

**B.      The Fraudulent Suppression Claim**

As alluded to previously, Mrs. Ford also claims a right to recover under a

theory of fraudulent suppression.  *See* Ala. Code § 6-5-102.  To prove fraudulent

suppression under Alabama law, it must be shown:

> (1) that the defendant had a duty to disclose an existing, material fact;
> (2) that the defendant had actual knowledge of the fact and its
> materiality; (3) that the defendant suppressed that fact; (4) that the
> plaintiff's lack of knowledge concerning that fact induced her to act; and
> (5) that she suffered actual damage as a proximate result of her acting.

*McAllister*, 675 So. 2d at 1296 (citing *Hardy v. Blue Cross & Blue Shield*, 585 So. 2d

29, 32 (Ala. 1991)).  *See also*, *e.g.*, *Waddell & Reed*, *Inc. v. United Investors Life*

*Insurance Company*, 875 So. 2d 1143, 1161 (Ala. 2003); *Ex Parte Household Retail*

*Services*, *Inc.*, 744 So. 2d 871, 879 (Ala. 1999); *State Farm Fire & Casualty*

*Company v. Owen*, 729 So. 2d 834, 837 (Ala. 1998).

The first task at hand is identifying the fact allegedly suppressed.  Mrs. Ford's

suppression argument, in her complaint and at trial, was that Kurt Eklund, Inc.

suppressed the very disclosures required by the TILA.  At times, however, Mrs. Ford

seems to argue that the fact suppressed was that she would not be permitted to pay

interest and redeem her property even after the sixty day redemption period had

expired.[60]  This variation of the claim makes little sense.  The ticket at the heart of this

---

[60] *See*, *e.g.*, doc. no. 31, ¶ 5(b) ("In fact, defendant suppressed that it would refuse to allow
her to pay interest and retain her property."); doc. no. 34 (Statement of Agreed and Disputed Facts),
p. 2 ("Plaintiff relied upon the permission given to her to pay late.").

transaction plainly indicated — in accordance with Alabama law, *see* Ala. Code § 5-19A-6 — that "[p]ledged goods not redeemed within 30 days following the originally fixed maturity date *shall be forfeited to the pawnbroker* and absolute right, title, and interest in and to the goods shall vest in the pawnbroker."[61]  The Alabama courts have repeatedly held that, "when a party receives documents which put it on notice of facts, the facts cannot have been suppressed."  *Robinson v. JMIC Life Insurance Company*, 697 So. 2d 461, 463 (Ala. 1997).  *See also Henson v. Celtic Life Insurance Company*, 621 So. 2d 1268, 1273-74 (Ala. 1993) (finding that where an insurance application made numerous references to the fact allegedly suppressed, no claim for suppression could lie); *Richardson v. Liberty National Life Insurance Company*, 750 So. 2d 575, 578 (Ala. Civ. App. 1999) (same holding).  That is precisely the situation here; thus, this argument is unavailing.

To the extent Mrs. Ford is implying that Sheila Eklund committed *promissory fraud* in allegedly assuring her that a post-redemption period payment would be acceptable, it is noteworthy that no such theory appeared in her complaint.  Of course, even if it did, the testimony does not bear out such a claim.  The court indicated above that it might be willing to credit Mrs. Ford's testimony alleging an oral agreement for post-*maturity date* payment, but it is absolutely not persuaded that there existed any

---

[61] Plaintiff's Ex. 1 (emphasis supplied).

agreement for post-*redemption period* payment.

Accordingly, Mrs. Ford must rely upon her chief argument — *i.e.*, that the pawnshop suppressed the very disclosures that the TILA requires.  It is beyond dispute that the pawn ticket in question did not contain the disclosures mandated by the Act, so proof of suppression itself is not an obstacle.  Even so, the court discerns no correlation between the absence of the disclosures and Mrs. Ford's decision to enter into the collateral loan arrangement.  *See McAllister*, 675 So. 2d at 1296 (requiring proof that "the plaintiff's lack of knowledge concerning that fact induced her to act").  Indeed, Mrs. Ford admitted that she went forward with the loan solely because she trusted the vendors.  True, she testified that an exorbitant annual percentage rate would have dissuaded her, but the court has a very difficult time believing that testimony in light of Mrs. Ford's concession that she was aware the loan required the payment of interest, but did not even bother to read the disclosures concerning the *monthly* interest rate that appeared on the face of the ticket.  That is, the presence or absence of disclosures made no difference whatsoever in the decision to do business with the Eklunds.

Furthermore, since it was the failure to redeem within the sixty day period permitted under Alabama law, *see* Ala. Code § 5-19A-6 — and not the inability to raise enough capital to discharge the loan — that caused Mrs. Ford to lose her

necklace, the suppressed facts did not proximately contribute to the injury identified. *See id.* (requiring a proximate causal connection between the suppression and the injury).  *See also In re Jones*, 403 B.R. 462, 468 (Bankr. N.D. Ala. 2003) ("Immediately after the thirty day redemption grace period expired . . . without the obligation being paid, the debtors' right, title, and interest in the vehicle vested in Mayhall pursuant to Ala. Code § 5-19A-6[.]").

The court therefore concludes that Mrs. Ford has failed to establish two essential elements of a fraudulent suppression cause of action.  Defendant Kurt Eklund, Inc. is due judgment on this claim.

## C.    Attorney's Fee and Costs

As mentioned above, Mrs. Ford is due her costs and an attorney's fee under the TILA, notwithstanding the fact that she prevailed only on her claim for statutory damages.  The court must now rule on the amount to be recovered in this regard.

Mrs. Ford's attorney submitted a billing sheet indicating $12,312.50 in legal fees.  Defense counsel has taken issue with the fact that Mrs. Ford's attorney charged his regular hourly fee for travel time, "[b]ut lawyers normally charge for their travel time.  That time is taken away from professional work, and thus involves an opportunity cost which is approximated by the lawyer's normal billing rate multiplied

by the time spent in travel." *Matter of Pine*, 705 F.2d 936, 938 (7th Cir. 1983) (Posner, J.).  The court finds the fees charged, including those charged for travel, reasonable. *See* 6 *Federal Procedural Forms* § 14:21 (2006) (noting that, regardless of the amount of recovery, proper compensation for attorneys is necessary to "vindicate the Congressional goal of creating a system of private attorneys general to aid in effective enforcement of the Truth in Lending Act"). *See also Matter of Pine*, 705 F.2d at 938 ("[T]he language and structure of section 1640 make it doubtful that Congress wanted the provision for awarding attorney's fees to have no efficacy in single-violation suits to recover unlawful finance charges[.]").

The other itemized expenses, however, require more detailed analysis.  The billing sheet lists a charge of $32.30 for copying and scanning, and another charge of $1,310.62 for incidental "attorney expenses," such as meals, deposition / transcript costs, hotels, mileage, and postage.[62]  Some of these expenses (*i.e.*, deposition fees, printing and scanning) are properly denominated as costs, not fees.  *See* 28 U.S.C. § 1920(2)-(4) (listing court reporter fees, printing, and exemplification charges as taxable "costs"); *EEOC v. W & O, Inc.*, 213 F.3d 600, 620 (11th Cir. 2000) (noting that necessary deposition expenses are taxable as "costs" under § 1920(2)).  Although the billing sheet does not list the $250 filing fee, it is notable that such a fee

---

[62] Plaintiff's Ex. 9.

comprises part of the recoverable costs.  *See* 28 U.S.C. § 1920(5).   Therefore, the court will tax the following charges as costs:

| | | |
|---|---|---|
| • | Depositions: | $360.85 |
| • | Filing fee: | $250.00 |
| • | 237 photocopies at $0.10 each: | $ 23.70 |
| • | 86 scanned pages at $0.10 each: | $ 32.30 |
| | **Total = $666.85** | |

Others charges from the billing sheet — such as postage, travel expenses, and meals — are not traditional attorney "fees," and do not otherwise appear to qualify as costs, either.  *See* Wright, Miller & Kane, 10 *Federal Practice & Procedure* § 2677 (3d ed. 2006) (noting that "taxation [of costs] usually is denied for expenses such as . . . travel by attorneys, [and] . . . postage").  Nevertheless, the court is of the opinion that Mrs. Ford's attorney should be reimbursed for his mileage, hotel charges, and postage, since these are adjunct expenses that were occasioned by, and normally would be passed along to, the client. *Cf. West v. Nabors Drilling USA*, *Inc.*, 330 F.3d 379, 395-96 (5th Cir. 2003) (holding that out-of-pocket travel expenses are not *per se* non-recoverable and, indeed, *may be* taxed "as part of attorney's fees").

This leaves only the question of whether plaintiff's counsel is due reimbursement for meals purchased while out of town, on business related to this case.  The court recognizes that there are cases where attorneys have been reimbursed

for meals, but rarely is any effort made to justify such an award.  The fact of the matter is that meals must be eaten regardless of where one is located; and there is no indication here that the lunches listed on counsel's billing sheet were "working lunches."  Accordingly, the court declines to award any reimbursement for lunches or dinners, and the total attorney's fee award will be as follows:

| | | |
|---|---|---|
| • | Legal work: | $12,312.50 |
| • | Postage / Shipping: | $     26.11 |
| • | Mileage: | $    550.00 |
| • | Hotel charges: | $    288.56 |
| | | **Total = $13,177.17** |

This accounts for all line-items on the billing sheet.

## PART THREE

### *Conclusion*

For the foregoing reasons, the court finds in favor of Mrs. Ford on her Truth in Lending Act claim for statutory damages in the amount of $800, plus attorney's fees and costs in the aggregate amount of $13,844.02, but also concludes that she is not entitled to actual damages under that Act or any relief under Alabama law.  A final judgment consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 27th day of April, 2007.

_____
United States District Judge